IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JEFFREY HOLLAND ) | |
| ) | |
| DEFENDANT, ) | |
| ) | |
| V. ) | CRIMINAL NO. 1:CR-01-195-02 |
| ) | |
| ) | FILED |
| ) | HARRISBURG PA |
| UNITED STATES OF AMERICA ) | |
| ) | JAN 19 |
| RESPONDED . ) | |
| | MARY E. D'ANDREA, CLERK |
| | Per _____ |
| | Deputy Clerk |

" HOLD MOTION IN ABEYANCE "

Now comes Jeffrey Holland, seeking this Court permission to hold motion in abeyance untill the Supreme court have made there ruling. Whether or not Blakely should apply retroactively to case on collateral review.

RESPECTFULLY SUBMITTED,

*/s/ Jeffrey Holland*
JEFFREY HOLLAND #36909-083
UNITED STATES PENITENTIARY
LEE COUNTY
P.O.BOX 305
JONESVILLE Va. 24263-0305

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

Jeffrey Holland           :
                          :
        Defendant,        :
                          :
v.                        :          1:CR-01-195-02
                          :
UNITED STATES OF AMERICA, :
                          :
        Plaintiff.        :

## BLAKELY APPLIES RETROACTIVELY

NOW COMES Jeffrey Holland, seeking permission to initiate appellate review of the district court's order filed December 5, 2005, denying motion to correct sentence pursuant to 28 U.S.C. §2255. Hence this court should limit its examination to a threshold inquiry into the underlying merit of the claim rather than ruling on the merit. **Miller-El v. Cockrell**, 153 L.Ed.2d 931.

Hereinbelow defendant proceeds to demonstrate a substantial showing of the denial of a constitutional right. Thus defendant can satisfy this standard by demonstrating that jurists of reason could (1) disagree with the district court's resolution of his constitutional claims or (2) conclude the issues presented herein are adequate to deserve encouragement to proceed further.

In a habeas corpus proceeding in which the detention complained of arises out of process by a court an appeal by the applicant for the writ may not proceed unless a district or a circuit judge issue a certificate of appealability pursuant to §2253(c) of Title 28, United States Code. If an appeal is taken by the applicant, the district judge who rendered the judgment shall either issue a certificate of appealability or state the reasons why such a certificate should not be issued.

The certificate or the statement shall be forwarded to the court of appeals with the notice of appeal and the file of the proceedings in the district court. See **Hunter v. U.S.**, 101 F.3d 1565.

### BACKGROUND

Defendant was convicted following jury trial of distribution and possession with intent to distribute fifty grams or more of crack cocaine in violation of 21 U.S.C. §841(a)(1) and 18 U.S.C. §2 and conspiracy to distribute and possess with intent to distribute fifty grams or more of crack cocaine. His conviction and sentence were affirmed by the Third Circuit Court of Appeals and soon after the Supreme Court denied his petition for writ of certiorari on January 12, 2004.

Defendant filed the instant motion to correct judgment and sentence pursuant to 28 U.S.C. §2255 ¶6(3). Defendant argued that his sentence violated the dictates of **Blakely v. Washington**, 124 S.Ct. 2531 (2004).

### THRESHOLD QUESTION

The threshold question presented herein is whether existing precedent in this circuit answer whether the rule announced in Blakely/Booker applies retroactively?

### DISCUSSION

The Supreme Court has not yet stated whether the rule announced in Blakely and Booker applies retroactively to cases on collateral review. The lower court decisions that the court was reviewing were direct appeals. Discussion of retroactivity would have been gratuitous and was not briefed. Consequently, no inference can be drawn from the court's failure to discuss that issue. In ascertaining whether Booker applies retroactively the first step is to clarify what rule the court announced a process complicated here by the unusual alignment of justices the remedy endorsed by five members of the court (which made the sentencing guidelines advisory) must not be confused with the constitutional violation at issue. The constitutional violation was the enhancement of a sentence above the statutory maximum based upon facts neither admitted by the

2

defendant nor found by a jury to be true beyond a reasonable doubt. The step in analyzing retroactivity is to determine whether Blakely and Booker announced a new rule. A case announces a new rule if the result was not dictated by precedent existing at the time the defendant conviction became final. See **Teague v. Lane**, 489 U.S. 288, 301 (1989).

Defendant's conviction was final in January 12, 2004, way after the decision in **Apprendi v. New Jersey**, 530 U.S. 466 (2000) although Blakely and Booker are extensions of Apprendi the latter's application to the federal sentencing guidelines was not dictated by Apprendi.

Prior to Blakely every circuit that considered the question concluded that Apprendi did not apply to federal sentencing guidelines. See **United States v. Hernandez Guardado**, 228 F.3d 1017. Whether Booker was dictated by Blakely presents a closer question.

Defendant's conviction became final before either Booker or Blakley was announced. Even if Booker were dictated by Blakely; it would still constitute a new rule so far as defendant is concerned. The next step is to decide whether the new rule is substantive or procedural. A rule is substantive for the present purpose if it alters the range of conduct or the class of persons the law punishes. Rules that regulate only the manner of determining the defendant's culpability are procedural. See **Schriro v. Summerlin**, 124 S.Ct. 2519 (2004) applying this definition the rule announced in Blakely and Booker is procedural.

New substantive rules generally apply retroactively because they necessarily carry a significant risk that a defendant stands convicted or an act that the law does not make criminal "or faces a punishment the law cannot impose upon him." Id. at 2522-23. New rules of procedure generally are not retroactive they merely raise the possibility that some one convicted with use of the invalidated procedure might have been acquitted otherwise.

Because of this more speculative connection to innocence retroactive effect is given to only a small set of watershed rules of criminal procedure implicating the

3

fundamental fairness and accuracy of the criminal proceeding. Id. at 2523. (citations omitted). It is a prime instrument for reducing the risk of convictions resting on factual error. The reasonable doubt standard is indispensable to command the respect and confidence of the community in applications of the criminal law. See **Ivan V. v. City of New York**, 407 U.S. 203, 205 (1972)(purpose of reasonable doubt standard is to overcome an aspect of a criminal trial that substantially impairs the truth finding function and Winship is thus to be given complete retroactive effect). **Hankerson v. North Carolina**, 432 U.S. 233 giving retroactive effect to rule requiring proof of all elements of crime beyond a reasonable doubt and voiding presumptions that shift burden of proof to defendant.

Winship, Ivan V, and Hankerson predate the retroactivity standard announced in Teague. Those decisions also concerned the validity of the underlying conviction rather than a sentence enhancement. On the other hand at least five justices have said that sentence enhancements are of sufficient importance to warrant application of the reasonable doubt standard in some instances. See Apprendi, Blakely and Booker supra. Given this history this court cannot exclude the possibility that the Supreme Court might apply Blakely retroactiviely in some situations.

### DEFENDANT IS ENTITLED TO RELIEF

Under the standard first articulated in Teague the only apparent justification for retroactive application of Blakely/Booker would be to redress potential miscarriages of justice resulting from an inaccurate fact finding procedure. See Exhibit A, where defense counsel objection is to the probation officer use of the murder of Jason Harrigan in calculating the guidelines. Because defense counsel actually disputed the facts that resulted in the sentence enhancements and the court decided the matter against him using the wrong standard of proof, he is entitled to relief because the government sought the court to use the preponderance of the evidence standard in order to conclude its mandatory to impose additional point level adjustments which also qualified through relevant

4

conduct find at U.S.S.G. 1B1.3(A)(1)(a) applicable to both counts one and five. Where it further applied a total office level of "forty-three" (43) criminal history category of VI which resulted in a guideline sentence of life imprisonment at (zone D) based on U.S.S.G. chapter 5 part A pursuant to 2K2.4. See Exhibit B where the government further advised the court the fact that the jury was unable to reach a verdict on the court charging the defendant with murder does not preclude the conduct from being considered, by this ruling is totally in opposite with Supreme Court's Booker finding (unconstitutional).

### CERTIFICATE OF APPEALABILITY SHOULD BE ISSUED

The next question is whether certificate of appealability should be issued in this case. Congress has provided that a certificate of appealability may be issue "only if the applicant has made a substantial showing of denial of a constitutional right." 28 U.S.C. §2253(c)(2). The constitutional violation at issue herein is the enhancement of a sentence above the "statutory maximum" based upon facts neither admitted by the defendant nor found by a jury to be true beyond a reasonable doubt.

In the instant case the district court denied defendant motion on procedural grounds. However in Slack the Supreme Court held that when the district court denies a habeas petition on procedural grounds with out reaching the prisoners underlying constitutional claim, a certificate of appealability should be issued when the prisoner shows "like here" at least that jurists of reason would find it debatable whether the district court was correct in its procedural ruling. **Slack**, 529 U.S. at 484. The United States Supreme Court has recognized a new right through Blakely/Booker and defendant has filed his claim based upon that right within the one year limitation period of 28 U.S.C. §2255 ¶6(3). As a result the claim is timely and appropriate filed.

Hence it should be noted that the district court established defendant "life sentence" under the mandatory sentencing guidelines that the Supreme Court declared

5

unconstitutional.

The Supreme Court in Booker severed and excised the provisions of the federal sentencing statute that made the guidelines mandatory. See Booker as modified the federal Sentencing Reform Act of 1984 makes the guidelines effectively advisory a dramatic change from the past 18 years. The Booker rule then is that the binding federal guideline system is unconstitutional. That means defendant who was sentenced under that binding system was unconstitutionally sentenced. To be constitutional the sentence would have had to recognize that the guidelines were "advisory" only. The district court in this case considered the guidelines mandatory. Thus it cannot be said that defendant claim regarding enhancing his sentence above the statutory maximum based upon facts neither admitted by him nor found by a jury to be true beyond a reasonable doubt is not debatable among jurists of reason.

Therefore as the record fully and properly reflect sufficient indicia warranting objections which under ordinary prudential doctrines and standard will cause said illegal enhancement errors to be preserved especially where they were also argued in the district court. Movant seek this court to render sentence unconstitutional and appoint counsel so that the matter could be fully presented to the court for consideration of movant appeal by applying Blakely retroactively to defendant's case.

Respectfully submitted,

By: *Jeffrey Hollond*  pro se
Jeffrey Hollond
#36909-083
United States Penitentiary
Lee County
P.O. Box 305
Jonesville, Va. 24263-0305

6

## CERTIFICATE OF SERVICE

I Jeffery Holland hereby certify that a true and accurate copy of the foregoing notice of appeal and incorporated attached application for certificate of appealibility has been served on all interested person via U.S. mail postage prepaid to ensure the delivery of same as follows:

William A. Behe (A.U.S.A.)
Federal Building 228 Walnut Street
Harrisburg, PA 17108

*Jeffrey Holl* [signature]
Jeffrey Holland  pro se
#36909-083 Penitentiary
Lee County
P.O. Box 305
Jonesville, Va. 24263-0305

7

ADDENDUM TO THE PRESENTENCE REPORT

United States District Court For The Middle District of Pennsylvania
United States v. Jeffrey Holland, Dkt. No. 1:CR-01-192-02

"Exhibit A"

OBJECTIONS

By the Government

None.

By the Defendant

Defense counsel's only objection (attached) is to the probation officer's use of the murder of Jason Harrigan in calculating the guidelines.

> In summary, counsel says that no weapons were ever recovered, there was no physical evidence linking the defendant to the shooting and the jury was unable to reach a verdict on the count charging the defendant with homicide. Counsel notes that there were individuals other than Mr. Holland and his coconspirators who had previous disagreements with Jason Harrigan. The defendant offers that investigative reports disclose that a resident of Camelot Village saw an unidentified white man running from the area immediately after the shots were heard. He notes that a taxi driver reported that she saw two black males in their early twenties in the vicinity of Camelot Village after the murder, they flagged her down, and she noticed that one of them was holding something in the front pouch of his sweatshirt. Counsel notes that with the exception of Toyann Anderson, the witnesses who implicated Mr. Holland in the homicide had extensive criminal backgrounds, were incarcerated at the time of their testimony, and had plea agreements with the Government which could substantially reduce their potential sentence in pending prosecutions against them. Counsel submits that even if the testimony from the various witnesses is somehow deemed sufficient to establish Mr. Holland's involvement in the killing by a preponderance of the evidence, <u>it must further be established that the killing was carried out in furtherance of the drug conspiracy.</u> Counsel believes that if the killing was done for some personal motive or some other disagreement, it would not comprise relevant conduct for purposes of sentencing. Counsel submits that there is very little evidence regarding the reason for the homicide and that the evidence proffered, specifically that of Toyann Anderson, is not sufficient to establish the homicide as one carried out in furtherance of the drug conspiracy.

"Exhibit B"

The probation officer stands by the presentence report and trial testimony and witness interviews which consistently reveal that Mr. Holland, Harvey Holland and Shawn Anderson, by a preponderance of the evidence, killed Jason Harrigan. The fact that the jury was unable to reach a verdict on the count charging the defendant with homicide does not preclude the conduct from being considered by the Court for sentencing as it is relevant conduct under USSG § 1B1.3(a)(1)(A). The evidence seems convincing that Mr. Holland and the others killed Mr. Harrigan. Nine individuals either testified or told agents of conversations they had with Mr. Holland and/or Harvey Holland and Shawn

Anderson concerning their involvement in the murder. Those individuals link the killing with drug trafficking and the drug conspiracy. The killing took place during the time frame charged in the drug conspiracy count (V). Toyann Anderson testified that she pointedly asked Mr. Holland and Shawn Anderson if they had done the shooting, to which they replied affirmatively and reiterated, "Yeah, we had to take care of that nigger because he was talking about getting our profits." Ms. Anderson said that the "profits" were from drug sales. Anthony Braxton told investigators that Holland had an ongoing dispute with another drug dealer from New York known as "J" (Harrigan). Ezerrell Bynum told investigators that Jeffrey Holland related to him how he had tried to work out an arrangement with Jason Harrigan regarding the sale of drugs and the sharing of assets in business. Bynum recalled Holland telling him that Harrigan essentially told him that he wanted no part of it. Omar Dykes told investigators that he recalled Holland telling him that he had a falling out with Harrigan over a drug debt.

Should the Court find for the defendant, the guidelines would be calculated pursuant to USSG § 2D1.1 and result in a base offense level of thirty-eight because the amount of crack cocaine is one and one-half kilograms or more. Toyann Anderson recalled that for several months until October 2000, she saw Mr. Holland and Shawn Anderson cut large pieces of crack cocaine into smaller pieces for resale on at least twelve occasions and estimated that they would package several ounces of crack cocaine at a time. At least three ounces of crack cocaine on each of twelve occasions equals 1,020.60 grams.

\* Jody Covington was in New York in January 2001 with the defendant and others when they bought a "baseball size" quantity of crack cocaine.

\* Mark Hughes testified that he went to New York with the defendant three times to get crack cocaine. He said that on each of two occasions the defendant got one half kilogram quantities of crack, and on the last occasion bought four ounces for a total of approximately 1,113.4 grams.

\* The testimony of Wayne Williams alone establishes the defendant's involvement with one and one-half kilograms or more. He said that he helped the defendant and Shawn Anderson bag up crack cocaine between fifteen and twenty times and recalled that they bagged about seven ounces each time. Seven ounces on at least fifteen occasions equals 2,976.75 grams.

Adding two levels for obstruction of justice would result in a total offense level of forty and a guideline range of 360 months - Life imprisonment.

RESPECTFULLY SUBMITTED,

John K. Vought
Senior U.S. Probation Officer

Approved:

Edward J. Kosheba      7/27/02
Deputy Chief U.S. Probation Officer   Date

# TURNER AND O'CONNELL
### ATTORNEYS AT LAW
#### 4415 NORTH FRONT STREET
#### HARRISBURG, PA 17110

JAMES H. TURNER  
TIMOTHY J. O'CONNELL

TELEPHONE  
717-232-4551

FAX  
717-232-2115

September 25, 2002

John K Vought  
U.S. Probation Officer  
United States District Court  
P.O. Box 805  
Harrisburg, PA 17108



RE:  USA v. Jeffrey Holland  
      No. 1:CR-01-195-02

Dear Mr. Vought:

    The defendant submits the following in support of his objection to inclusion of the Jason Harrigan homicide as relevant conduct under U.S.S.G. Section 2D1.1(d)(1): No weapons used were ever recovered and no physical evidence linking the defendant to the shooting was found. The jury was unable to reach a verdict on the count charging the defendants with the homicide and the charge was subsequently dismissed upon motion of the United States Attorney.

    Police reports compiled during the investigation of the homicide by the Susquehanna Township Police Department disclose the names of individuals other than the charged defendants who had previous disagreements with the decedent Harrigan. A friend of Harrigan by the name of Eugene McDonald stated that Harrigan had a "major problem" with two men named "Nitty" (Frankie Gordon) and "Jabar" (Robert Baylor). Harrigan told McDonald Harrigan had exchanged words with Nitty at Roebucks bar and then it turned into a fistfight. The following day both were again at Roebucks and the fight resumed. Outside the bar, Jabar, a friend of Nitty, pulled a gun and shot Black, a friend of Harrigan's, in the shoulder. After that, a number of shots were fired, according to McDonald. McDonald reported that he thought the grudge was still outstanding at the time of Harrigan's murder.

    The reports further disclose that the decedent's girlfriend, cousin and other friends referred to a person by the name of "James" who was believed to be a rival drug dealer on the hill who "had it out" for Harrigan. The identity of "James" was never determined.

John K. Vought
September 25, 2002
Page 2

On the evening of the murder, the reports also disclose that a resident of Camelot Village saw an unidentified white man running from the area immediately after the shots were heard. A taxi driver reported that shortly after the time of the homicide, she saw two black males in their early twenties in the vicinity of Camelot Village. They flagged her. She said one of the individuals seemed to be holding something in the front pouch of his sweatshirt. She gave the other individual a ride to a location on Walker Mill Road but not specifically in front of any residence. The cab driver said it was against policy to pick up individuals in this manner and that they made her very nervous. The identity of these individuals was never determined.

The witnesses who implicated the defendant in the homicide testified that the defendant made admissions that he had been involved. With one exception, the witnesses who testified to alleged admissions made by the defendant had extensive criminal backgrounds, were incarcerated at the time of their testimony, and had plea agreements with the government which could substantially reduce their potential sentence in pending prosecutions against them. The one exception, Toyanne Anderson, was the sister of one of the defendants and was involved in transporting and storing drugs for the defendants. She was never charged for her admitted involvement in the activities. She testified at trial that while she was in the back seat of an automobile driven by Shawn Anderson, the defendants admitted killing the decedent, Jason Harrigan, because of "some kind of drug conflict." Anderson had earlier given a statement to Detective James Heilig and S.A. Dan Craft that the killing followed an incident at Roebucks Tavern in Harrisburg. According to Ms. Anderson, Shawn Anderson had approached Harrigan's girlfriend (who was also in the shooting) not knowing that she was with Harrigan and a confrontation occurred. Ms. Anderson said Harrigan got "all up into Shawn's face" and following this episode the defendants followed Harrigan out to Camelot Village and "shot the guy." She testified that in another conversation "they had to pull out on that nigger because he wanted their profits." Statement (4-3-01 page 4). Tanika Bland, the decedent's girlfriend, testified in some detail at trial of the activities of the decedent and herself the evening of the homicide. At no time did she make any reference to Roebucks Tavern or any confrontation with the defendants. If such a confrontation did not occur, it raises a question as to Toyanne Anderson's accuracy as a witness. If such a confrontation occurred and if it was a motivating factor for the homicide, it raises a question as to whether the killing was drug related at all. It should also be pointed out that in this same statement Ms. Anderson described Shironda Posey as the "mastermind" of the alleged drug business conducted by the defendants. This contention was not supported by any other evidence in the government's case.

Anthony Braxton testified as to an admission allegedly made by Jeffrey Holland regarding the Harrigan homicide. (P.S.R. para. 34). Braxton was charged in the original indictment with Jeffrey Holland, Shironda Posey, Shawn Anderson and Rebekah

John K. Vought
September 25, 2002
Page 3


Christopher. If convicted, Braxton would have qualified as a career offender. In return for his promise of cooperation, he was allowed to plead to a two-count information charging interstate travel in aid of drug trafficking carrying a maximum sentence of ten years. The plea agreement further provided for a potential 5K1.1 departure for substantial assistance.

Shironda Posey testified as to alleged admissions made by Jeffrey Holland. Posey, who was also charged in the original indictment with Jeffrey Holland, was permitted, in return for her cooperation, to plead to a one-count indictment charging the use of a telephone to facilitate a drug offense. This offense carries a four-year maximum penalty. The plea agreement also provided for a downward departure under 5K1.1 for substantial assistance.

Ezerell Bynum, aka Waleed Thomas, testified as to alleged admissions made by the defendant and his co-defendants on an occasion he was in Harrisburg for a "PennDOT issue." Bynum had an extensive criminal record including arson, kidnapping, receiving stolen property and controlled substance convictions. At the time of his testimony, Bynum was awaiting sentence on the charge of uttering fictitious financial instruments. He testified pursuant to a plea agreement providing for a 5K1.1 departure for substantial assistance. He admitted on cross examination that the "PennDOT issue" which brought him to Harrisburg was the procurement of a false identification card under the name of his cousin Waleed Thomas to assist him in avoiding arrest in the event he was stopped for an arrest warrant he knew was outstanding.

Aaron Pitts testified to alleged admissions made by the defendant about the homicide while the two were housed in Dauphin County Prison. (P.S.R. para. 39). Pitts had previously plead guilty pursuant to a plea agreement putting a cap on his potential sentence for distribution of a controlled substance. He would have otherwise been exposed to a sentence as a career offender. The agreement also provided for a 5K1.1 departure for substantial assistance.

Omar Dykes did not testify but was interviewed by investigators regarding alleged admissions he claimed the defendant made while housed at the Dauphin County Prison. At the time of this testimony, Dykes, who had been charged in a drug related homicide, was testifying as part of a plea agreement charging him with 18 U.S.C. 924(j) carrying a ten-year maximum sentence. The agreement also provided for a downward departure for substantial assistance.

It is submitted that in the absence of any eyewitness testimony or physical evidence linking the defendant to the Harrigan homicide, the evidence is insufficient to establish defendant's involvement by a preponderance of the evidence. Each witness who testified as to alleged admissions made by the defendant had something to gain from their testimony and all but Toyanne Anderson had extensive criminal records. Even if testimony from the sources was somehow deemed sufficient to establish defendant's

John K. Vought
September 25, 2002
Page 4

involvement in the killing by a preponderance of the evidence, it must further be established that the killing was carried out in furtherance of the drug conspiracy. If it was done for some personal motive or some other disagreement it would not comprise relevant conduct for purposes of sentencing. It is submitted that there is very little evidence regarding the reason for the homicide. The evidence which was proffered, specifically that of Toyanne Anderson, is not sufficient to establish the homicide as one carried out in furtherance of the drug conspiracy.

                                                    Sincerely,

                                                  Timothy J. O'Connell

TJO:sf

Honorable William W. Caldwell
228 Walnut St, Federal Building
Harrisburg PA 17101