IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

JEFFREY HOLLAND

      v.                                  Criminal No.: 1:CR-01-195-02

UNITED STATES OF AMERICA

## MOTION FOR EQUITABLE RELIEF UNDER ARTICLE III OF THE UNITED STATES CONSTITUTION OF 28 FED. R. CIV. P. 60(b)(6)

### Summary of the Case

On June 6, 2002 following a jury trial, the petitioner was convicted of distribution and possession with intent to distribute fifty grams or more of crack cocaine in violation of 21 U.S.C. §841(a)(1) and 18 U.S.C. §2 (Count I), use of a firearm in furtherance of a drug trafficking crime in violation of a drug trafficking crime in violation of 18 U.S.C. §924(c) and 18 U.S.C. §2 (Count III) and conspiracy to distribute and possess with the intent to distribute fifty grams or more of crack cocaine in violation of 21 U.S.C. §846 (Count V).

The petitioner was sentenced to concurrent terms of life imprisonment on Counts I and V and concurrent terms of 60 months on Count III.

Petitioner Holland appealed his conviction and soon after his appeal was denied by the Third Circuit on September 23, 2003.

Petitioner Holland then petitioned for certiorari to the United States Supreme Court, and on February 23, 2004 certiorari was denied.

Petitioner then filed his initial 2255 which was also denied. Petitioner Holland also filed "rehearing en banc" which was denied January 12, 2006.

FILED
HARRISBURG, PA

NOV 23 2007

MARY E. D'ANDREA, CLERK
Per_____
Deputy Clerk

## FACTS SUPPORTING WHY PETITIONER/HOLLAND SHOULD RECEIVE REQUESTED RELIEF FROM THE OPERATION OF HIS PRESENT JUDGMENT

Petitioner/Holland begins by arguing that this Circuit visited an issue in which a defendant attempted to advance that the "threshold amount of §841(a)(1), Prohibited Acts", relating to his penalty phase of §841(b)(1)(A) was not determined beyond a reasonable doubt. This issue was misplaced based on the fact defendant pled guilty, allowing a reliable preponderance standard to be used when calculating drug quantity. See United States v. Gori, 324 F.3d 234, 236-37 (3rd Cir. 2003). Therefore, Gori's reliance on United States v. Winston, 37 F.3d 235, 240-41 (6th Cir. 1994), and United States v. Walker, 160 F.3d 1078, 1093 (6th Cir. 1998), was inapplicable to his circumstance. This Circuit to date concedes that "no case squarely addresses this issue", and finds persuasive United States v. Pruitt, 156 F.3d 638, 644-45 (6th Cir. 1998), quoted in Gori, id. 237.

Petitioner/Holland argues Pruitt and its predecessors or progencies such as United States v. Myers, 102 F.3d 227 (6th Cir. 1996), United States v. Miele, 989 F.2d 659 (3rd Cir. 1993), United States v. Mannino, 212 F.3d 835 (3rd Cir. 2000), and United States v. Knight, 266 F.3d 203 (3rd Cir. 2001), rely on a "focus inquiry": Myers entails, when an improper jury instruction is given, vicarious liability theory cannot sustain conviction, unless all the elements of the crime alleged have been proven. Miele entails, that the district court cannot rely on theories regarding size to conclude that specific drug quantities exist. Mannino entails, that sentencing a defendant on the basis of materially untrue assumptions violate due process. And Knight entails a defendant is entitled to have his sentence determined in accordance with application of the law. Supporting if petitioner/Holland is allowed to address, advance and support with the record that his jurors "never determined the necessary threshold amount

2

needed to support his conviction", then a [structural error] did in fact occur and operation from his present judgment should be disturbed.

Petitioner/Holland argues that count five of his indictment alleged that he possessed with the intent to manufacture and distribute 50 grams or more of cocaine base, all in violation of 21 U.S.C. §846. See Indictment, Count Five attached as Exhibit One. Petitioner/Holland argues at his trial the entire scope of testimony failed to establish that he possessed or distributed the [mandatory threshold amount of 50 grams or more of cocaine base]. The record indicates at petitioner/Hollands trial the government's key witness (Anthony Braxton) testified that he knew petitioner/Holland as Jabril or Jeff and claimed he came to Harrisburg, PA, from New Jersey to distribute narcotics. See Trial Transcripts pg. 206; line 15-17 and pg. 207; line 7-11 attached as Exhibit Two. Government witness Braxton then stated, petitioner/Holland and him started out selling small amounts of cocaine, which led to bigger amounts. See Trial Transcript pg. 207; line 22-25 attached as Exhibit Two, and claimed he never lived in Harrisburg, PA, but was back and forth from there to Jersey. See Trial Transcript pg. 208; line 1-8 attached as Exhibit Two, and petitioner/Holland and him would pack up 20 dollar packages for distribution and would hide the drugs in various areas in Harrisburg. See Trial Transcript pg. 209; line 2-6 attached as Exhibit Two. The record reflects that government witness Braxton "merely described" for the Court what he thought was large quantities of crack by stating large amounts being anywhere from 28 grams, one ounce, 1/8 of a key (kilogram), 1/2 of a key or one key. The government's attorney then asked government witness Braxton if petitoiner/Holland ever bought that much. Government witness Braxton stated he can't say if it was exactly a kilogram. But over a period of time and added up together in two or three years of drug trafficking, would total

well over a thousand grams or more.  See Trial Transcript pg. 210; line 21-25 and pg. 211; line 1-17 attached as Exhibit Two, and petitioner/Holland would have his amount and Shawn Anderson would have his amount and he would have his amount.  See Trial Transcript pg. 214; line 19-21 attached as Exhibit Two.

Next the government's attorney asked government witness (Hawkins) how much crack cocaine would he buy from them.  Government witness Hawkins stated twenty up to fifty, which was twenty to fifty dollars worth, and petitioner/Holland and Mr. Anderson bought crack cocaine to his house to repackage and bag for resale, which lasted six months, two times a week.  And they would bring about an ounce on each occasion for rebagging.  See Trial Transcript pg. 296; line 23-25, pg. 297; line 1-2; line 18-25 and pg. 299; line 1-5 attached as Exhibit Two.

Next government witness (Tonya Anderson) was questioned by the attorney for the government, and stated she saw petitioner/Holland cutting up crack with a little blade, but was "not familiar with drugs", but it looked like to her it was crack cocaine.  It was white.  See Trial Transcript 343; line 16-25 attached as Exhibit Two.

Government witness Anderson was then told by the government's attorney to tell the jury the dimension of the size of crack cocaine that was being purchased, she stated that maybe the size of a tennis ball.  And when asked by the government's attorney what it cost, government witness Anderson stated: "I'm just going to estimate.  I think maybe three, maybe four thousand dollars." See Trial Transcript pg.. 347; line 7-9 attached as Exhibit Two.

Next was government witness (Sharanda Shimese Posey) when asked by the government's attorney to give the jury an idea of how much petitioner/Holland was buying, she stated on ocassions, she went four or

five times from New York back to Harrisburg, PA, and stated $2,000 to $2,100 dollars worth.  The government's attorney then asked her again how much drugs petitioner/Holland was buying, government witness Posey stated, [she didn't understand, and asked what the prosecutor wanted her to say regarding quantity], the government attorney then stated because she (government witness Posey) had sold before and been around petitioner/Holland [maybe she knew the quantity that a person could buy].  Government witness Posey answered a couple of ounces, and when asked by the government attorney on each occasion, government witness Posey answered yes.  See Trial Transcript pg. 160; line 25 and pg. 161; line 1-25 attached as Exhibit Two.

Finally, when government witness (Kecia Holmes) was asked by the government's attorney to describe how much cocaine petitioner/Holland had, she stated it was a block of cocaine, and when told by the government's attorney to look at a Kleenex box regarding size, she stated probably that size.  See Trial Transcript pg. 454; line 21-25 and pg. 455; line 1-7 attached as Exhibit Two.

**Argument:**

Petitioner/Holland argues that a [structural error] occurred at his trial in which the jury was instructed to establish the "drug quantity" which was an [element of the crime charged] and Judge Caldwell determining the drug quantity instead of petitioner/Holland's jurors, violated his (due process rights) afforded in the Fifth Amendment of the United States Constitution and his (substantial rights to a fair trial) afforded in Sixth Amendment of the United States Constitution.  The constitutional right to a jury trial embodies "a profound judgment about the way in which law should be enforced and justice administered."  It is a structural guarantee that reflect[s] a fundamental decision about the exercise of official power a reluctance to entrust plenary powers over the life and liberty of the

citizen to one judge or to a group of judges, a defendant may assuredly insist upon observance of this guarantee even when the evidence against him is so overwhelming as to establish guilt beyond a reasonable doubt. That is why the court has found it constitutionally impermissible for a judge to direct a verdict for the state. See United States v. Gaudin, 28 F.3d at 946-47, id. at 946 (quoting Sullivan v. Louisiana, 124 L.Ed.2d 182 (1991).

Petitioner/Holland argues the record supports his jurors were instructed if they found him guilty of distributing or possession of crack cocaine with intent to distribute, they would be responsible for determining the approximate quantity. See Jury Charge pg. 534; line 21-25 attached as Exhibit 3.

Judge Caldwell went on to charge the jury with instruction that if they find petitioner guilty of distribution and or possession of cocaine with the intent to distribute or conspiracy to do the same, they would be asked to determine amounts of drugs with which each defendant was involved beyond a reasonable doubt and [the term quantity means weight] and the quantity were 50 grams or more, five grams or more but less than 50 grams, or less than 5 grams, these were the three subsections of 841(b)'s that were charged. See Jury Charge pg. 546; line 23-25 and pg. 547; line 1-10 attached as Exhibit 3.

Judge Caldwell went on to charge jury that there was a lot of testimony about this substance crack cocaine. And it was described of course, [we didn't get any testimony about weight and so forth and so on]. See Jury Charge pg. 550; line 1-4 attached as Exhibit 3.

Petitioner/Holland argues according to the record there was [no actual testimony as to the actual weight/quantity of crack cocaine he possessed, distributed or had control of relating to the conspiracy or substantive

6

counts].

Because of this petitioner/Holland's jurors went into deliberations requested to know how much did a 20 dollar bag of crack weight, and this question was based on the jury having no reference to determine weight, nor was their any direct testimony or evidence as to specific weights or amounts attributed to petitioner/Holland and so on and so forth. See Jury Deliberation Question No. 4 sheet attached as Exhibit 4.

After the jury asked the question as it relates to drug quantity, which was an element of the crime charged, Judge Caldwell gave a supplemental instruction and stated to the jury: "And you indicate that you have no reference to determine weight no direct testimony as to the specific weight amounts etcetera."

Judge Caldwell then stated: "There was no testimony on this point I can agree with that." The Judge Caldwell stated: "There was testimony however, about quantity depending on what you believe, not necessarily weights] and witnesses described something as big as a box of Kleenex, another person described some cocaine as maybe the size of a baseball or orange. That is the only testimony that would enable you to come to some conclusion about weight"].

Judge Caldwell then stated that he didn't want the jury to have the impression that he was crediting that testimony, but there was reference to people bagging and preparing multiple ounces of cocaine, references to a half of kilograms, and he was just having them to recall it, so don't credit what he was saying as special, but he was just trying to remind the jury in a general way of a few things that he heard that might go to weight if you accepted it and believed it and so forth. See Supplemental Instructions to JUry Deliberation Question 4, pg. 2; line 3-14, pg. 3; line 24-25 and pg. 4; line 1-19 attached as Exhibit 5.

Petitioner/Holland argues where the district court erred and abused its discretion and violated petitioner/Holland's Fifth and Sixth Amendment rights under the United States Constitution violating his due process rights to a fair trial and committing a structural error affecting his substantive rights was due to the fact, once the jurors could not make a determination regarding quantity/weight as to the drug amount in relationship to petitioner/Holland's conspiracy charge for count five and the substantive drug counts which were count one and three, and expressed there was no reference to determine weight, no direct testimony as to the specific weight amounts. See Exhibit 4.

Judge Caldwell "committed an instructional error" by giving a misdescription of his initial jury instruction based on the fact he initially charged the jury with the fact that they were proved drug quantity by proof beyond a reasonable doubt [and the term quantity means weight] see Exhibit 3 pg. 547; line 6-14, but in Judge Caldwell's supplemental instruction he stated to the jurors [there was testimony however about quantity depending on what you believe, not necessarily weights].

Petitioner/Holland argues Judge Caldwell took on the role as a juror based on the fact if the jurors couldn't determine drug quantity/weight based on all the testimony it heard during trial and no new testimony or evidence was presented after they deliberated regarding no reference to determine weight, no direct testimony as to specific weight amounts it must be concluded that Judge Caldwell's instructional error in which he initially charged the jury to interpret quantity and weight as the same, but in Judge Caldwell's supplemental charge he charged the jury to interpret quantity depending on what they believed, not necessarily weight, forced the jury to view as quantity and weight as to different types of

objects.

Petitioner/Holland argues this misdescription of the burden of proof regarding quantity and weight being the same in Judge Caldwell's initial instruction to the jury, but being different in his supplemental instruction, supports the jury disregarded quantity, which vitiates all jury findings. In petitioner/Holland's case trial Judge Caldwell failed to allow the jury to determine the mandated threshold amount of §841(a)(1) prohibit acts and became a 13th juror at petitioner/Holland's trial, and was the wrong entity which judged his guilt. See Rose supra at 578, 92 L.Ed.2d 460, 106 S.Ct. 310 (1986)(stating no criminal trial can serve its function or be deemed as afforded one their basic protection when a judge takes on the role of a jury), supporting a structural error occurred at petitioner/Holland's trial and he must receive relief from the operation of his present judgement, based on the fact the evidence of materiality as to drug quantity "was not overwhelming in light of the fact the threshold amount of 50 grams or more of cocaine base could not have existed in the substantive counts or the conspiracy charge because it was not found by jury." See United States v. Cotton, 122 S.Ct. 1781 (2002) quoting Johnson v. United States, 520 U.S. 461, 466, 467 (1997).

Petitioner/Holland argues the evidence viewed most favorable to the government supports a reasonable minded jury could not have found substantial evidence that was presented in count one and three in relationship to the conspiracy charge for count five to adequately and sufficiently support the conclusion that petitioner/Holland was guilty of possession with intent to distribute 50 grams or more of cocaine base and it existed beyond a reasonable doubt. See Glasser v. United States, 62 S.Ct. 457 (1942).

Petitioner/Holland argues because Judge Caldwell gave a faulty

supplemental reasonable doubt instruction regarding quantity and weight being two different objects, but in his initial instruction after the jury deliberated concerning all the testimony and evidence gave instructions that quantity and weight was the objects, supports the jury could not have made any finding at his trial regarding the quantity/weight of drugs petitioner/Holland ever possessed, manufactured or distributed in a "single episode" in the excess of 50 grams or more of cocaine base. U.S. v. Winston, 37 F.3d 235, 241 (6th Cir. 1994); U.S. v. Sandlin, 313 F.3d 351 (6th Cir. 2002); U.S. v. Darmand, 3 F.3d 1578, 1581 (2nd Cir. 1993) and U.S. v. Santos, 195 F.3d 549 (10th Cir. 1999); teaches us before Judge Caldwell could rely on any drug quantity under subsection 841(b)(1)(A), a jury had to determine beyond a reasonable doubt that petitioner/Holland possessed with the intent to distribute 50 grams or more of cocaine base for each of his substantive drug counts which were count one and three as well as his conspiracy count which was count five, which could only be determined by a jury finding which is required under §841(a)(1); prohibit acts, before a judge can invoke their supervisory power of determining at sentencing the entire amount of drugs used in the scope of the conspiracy by the preponderance of the evidence based on quantity involved in the charged, and proven, violation of §841(a)" is what triggers the mandatory minimum and statutory maximum of [the subsection 841(b)'s], supporting that "subject matter jurisdiction was never established," because the jury never determined if petitioner/Holland ever possessed, manufactured or distributed in a "single episode" in the excess of 50 grams or more of cocaine Johnson, Cotton, Darmand, Winston, Santos and Sandlin, supports since petitioner/Holland has demonstrate that the district court erred by failing to allow the jury to make a finding as to the "threshold amount" need to support a federal statute was violated, in

the instant a "structural error" occurred in nature which affected his substantial rights, resulting in fact in a sentence of life for counts one, three and five, which mandates the operation of these judgments for the said counts should be distributed.

The Supreme Court's reliance on Kotteakas v. U.S., 66 S.Ct. 1239 (1946) in its relevant inquiry states it is not what sentence the district court might impose in an error free proceeding on remand, but instead whether the error that occurred affected the sentence that was actually imposed and the proper focus of the prejudice inquiry is on what actually happened as a result of the error, not what might happen in a subsequent proceeding. See U.S. v. White, 405 F.3d 208 at 223 n.10 (4th Cir. 2005).

Wherefore petitioner/Holland argues in light of Neder v. U.S., 119 S.Ct. 1827 (1999), because a structural error occurred at his initial trial and trial Judge Caldwell did not have "subject matter jurisdiction" to make inference to the jurors that the necessary threshold amount existed, which can never be deemed as equivalent to a finding by the jury of that element quantity/weight of the crime charged [which was the jurisdictional nexus mandated by §841], which had to be satisfied before Judge Caldwell could subject petitioner/Holland to any mandatory minimum or statutory maximum or statutory maximum sentence named in the subsections of the penalty phases of §841, making no punishment fundamentally fair as to counts one, three and five because petitioner/Holland was not afforded the "basic protection" guaranteed by a jury. Rose supra at 577, 92 L.Ed.2d 460, 106 S.Ct. 3101 (1986).

Petitioner/Holland's right to trial by jury reflects, what the Supreme Court about the way in which the law should be enforced and justice administered."

Petitioner/Holland has supported in light of the record presently

submitted disclosing that the district court failed to allow his jurors
to satisfy the mandatory treshold amount of 50 grams or more had been
violated under the prohibited acts of the statute of §841(a)(1), Judge
Caldwell "lacked subject matter jurisdiction to subject petitioner/Holland
to the mandatory minimum of 10 years or the statutory maximum of life, for
violating section 841, based on the record supporting this "structural
error" seriously affected the fairness, integrity or public reputation of
the judicial proceedings supporting petitioner/Holland's convictional
judgment must be reversed. See United States v. Cotton, 122 S.Ct. 1781
(2002) quoting Johnson v. U.S., 137 L.Ed.2d at 729.

**CONCLUSION:**

Wherefore petitioner/Holland believes the structural defective error
in which his jurors was denied the opportunity to determine if
petitioner/Holland possessed, manufactured or distributed 50 grams or more
of cocaine base which was the mandatory threshold amount of §841(a)(1)
prohibit acts based on the trial judge giving an instructional error in his
supplemental jury instruction in which in his initial stated quantity and
weight was the same object, but in his supplement stated quantity and
weight was two different objects violated petitioner/Haolland's Fifth and
Sixth Amendment rights (due process and a right to a fair trial) and this
defect must be noticed although petitioner/Holland made no contentions
concerning it based on Rule 60(b)(6) being described as the "catch-all"
clause because it provides the court with power to vacate judgments
whenever such action is "appropriate to accomplish [j]ustice" where relief
might not be available under any other clause in 60(b). See
Gonzalez    v.    Crosby,    162    L.Ed.2d    480    (2005)    quoting
Steel Co. v. Citizens for Better Environment, 523 U.S. 83, 94, 101 (1998)
and quoting Klapprott v. U.S., 355 U.S. 601, 614-615 (1949) supporting this

court must take certain "prophylactic measures" and allow justice to be served to prevent an injustice. See <u>U.S. v. Miller</u>, 197 F.3d 644, 646 (3rd Cir. 1998) quoted in <u>In re Wagner</u>, 421 F.3d 275 (3rd Cir. 2005) supporting the errors complained are deserving to have petitioner/Holland's preveat judgment vacated and remanded back to the district court to be resentenced under the charge of the prison term below the statutory minimum of his crime charged which is 119 months and if the government does not consent, vacate petitioner/Holland's judgment and remand for a new trial on counts one, three and five all done in good faith.

the prison term below the statutory minimum of his crime charged which is 119 months and if the government does not consent, vacate petitioner/Holland's judgment and remand for a new trial on counts one, three and five all done in good faith.

Dated:  October  *31* , 2007.


                                        Respectfully submitted,


                                        Jeffrey Holland, <u>pro se</u>

14

## CERTIFICATE OF SERVICE

I, Jeffrey Holland hereby certify that a true and correct copy of the foregoing motion has been served on the _27_ day of November, 2007, on the following, by first class mail postage prepaid, to:


> William Behe, Esquire
> U.S. Attorney Office
> 228 Walnut Street
> P.O. Box 983
> Harrisburg, PA 17108


> _Jeffrey Holland_
> Jeffrey Holland
> Reg. No. 36909-083
> U.S. Penitentiary Lee
> P.O. Box 305
> JOnesville, VA 24263

THE GRAND JURY FURTHER CHARGES THAT:

### COUNT V

Count I through IV of this Second Superseding Indictment are incorporated as if fully set forth herein as some but not all of the overt acts committed in furtherance of the conspiracy charged in this Count.

Beginning on or about January 1, 1997, and continuing through the end of April 2001, in Dauphin County, Harrisburg, Pennsylvania, and elsewhere, the defendants,

**JEFFREY HOLLAND, and**
**HARVEY HOLLLAND**

did intentionally and knowingly unlawfully combine, conspire, confederate and agree with each other, with Lavelle Gamble a/k/a "Boston", Sean Anderson, Shiranda Posey, Anthony Braxton, Rebekah Christopher and with other persons both known and unknown to the grand jury, to manufacture, distribute, and possess with the intent to manufacture and distribute 50 grams or more of cocaine base, also known as "crack" cocaine,  a Schedule II narcotic controlled substance.

All in violation of Title 21, United States Code, Section 846.

A TRUE BILL

_Laurie A. Snyder_
FOREPERSON

_1/4/02_
DATE

_Martin C. Carlson_
MARTIN C. CARLSON
UNITED STATES ATTORNEY

206

Braxton - Direct

1   A    Yes.  I have a brother that lives in New Jersey and a

2   sister living in Daytona Beach, Florida.

3   Q    How far did you go in school, sir?

4   A    Eighth grade.

5   Q    What type of work have you done in your life?

6   A    Anywhere from shipping, receiving to basically shipping

7   and receiving for warehousing, driver's jobs.

8   Q    Do you know the defendant Jeffrey Holland?

9   A    Yes, I do.

10  Q    Do you know the defendant Harvey Holland?

11  A    Yes, I do.

12  Q    Do you know an individual by the name of Shawn Anderson

13   -- or did you know?

14  A    Yes, I did.

15  Q    Did you know the defendant Jeffrey Holland by any other

16  name?

17  A    Jabril or Jeff.

18  Q    What about Harvey Holland?

19  A    Harvey or Harv.

20  Q    How long have you known these defendants?

21  A    Since 1988.

22  Q    From New Jersey?

23  A    Yes.  From East Orange, New Jersey.

24  Q    East Orange?

25  A    Yes.

207

Braxton - Direct

1    Q     How is it -- you guys grew up or lived together in that

2    community?

3    A     No.  We met in the drug trade.  I used to sell drugs

4    for them.

5    Q     So your relationship with them goes back that far?

6    A     Yes.

7    Q     Was there a point in time, sir, that you came to the

8    Harrisburg area?

9    A     1997.

10   Q     Why did you come to this community from New Jersey?

11   A     To distribute narcotics.

12   Q     Had you ever heard of the Harrisburg area?  Why of all

13   places would you come here?

14   A     Because I was asked to come here by Jeffrey Holland.

15   Q     That is what I wanted to ask you.  Can you tell us

16   about that, please?

17   A     Well, he had came home from jail -- from prison, and he

18   had moved to Harrisburg.  And when he got out, he had

19   contacted me, and he had informed me that he had started

20   selling drugs up there in the Harrisburg area and asked me

21   did I want to participate in it.

22          So I started coming up to Harrisburg.  Him and I

23   together, along with Shawn Anderson, would start distributing

24   small amounts of cocaine which led into more amounts, bigger

25   amounts.

208

Braxton - Direct

1    Q    When you say cocaine, you mean powder or crack?

2    A    Crack cocaine.

3    Q    Is it your testimony that your initial involvement in

4    the Harrisburg area was sort of a transitory one, here and

5    then back, here and then back to Jersey, or did you come here

6    and live?

7    A    I never came here and lived.  It was just back and

8    forth.

9    Q    When you first came here to the Harrisburg area at the

10   request of Jeffrey Holland, can you tell us if you know where

11   he was living at that time?

12   A    At the time, he was living at 1509 Herr Street.  I

13   think that was the address of his sister's house.

14   Q    Had you known Shawn Anderson before coming to

15   Harrisburg?

16   A    No, sir.

17   Q    So you meet him here?

18   A    Yes.

19   Q    Tell us about your involvement with Jeffrey Holland and

20   Shawn Anderson in distributing crack cocaine.  How would it

21   work?  What would your role be?  Where would you obtain

22   drugs?

23   A    We would go to New York, and we would see a gentleman

24   by the name of Pito.  We would buy large amounts of crack

25   cocaine.  It would be in powder form.  It would be cooked

209

Braxton - Direct

1    up.  And we'd transport the drugs back to Harrisburg.

2             And we would go to various locations in Harrisburg

3    such as Fifteenth and Briggs to a house and packed it up into

4    twenty dollar packages for distribution.

5             Once it's all packaged up, we would take the drugs

6    and hide it in various areas.

7    Q    That is what I wanted to ask you.  Tell the jurors some

8    of the various hiding places.

9    A    We would go into a graveyard and dig little holes, put

10   Tupperware bowls inside the ground.  Put large amounts of

11   crack cocaine in it, put the lid back on and cover it up.

12            We would distribute -- we would put it in

13   abandoned houses.  Or we would buy a car -- a just real cheap

14   car, maybe three or four hundred dollar car, and park it and

15   put the drugs in the car -- in the trunk of the car or inside

16   up under the seat somewhere.

17            We would move the car from time to time.  Like we

18   would leave the car in a neighborhood for maybe three or four

19   days or maybe a wee or two and then move the car somewhere

20   else.  So that if anyone noticed the car sitting there for

21   too long, it wouldn't get towed.

22   Q    How would you or Mr. Holland or Mr. Anderson take care

23   of customers; how would you be contacted?

24   A    Through a pager device.

25   Q    Can you explain that, please, to the jury, how that

210

Braxton - Direct

1    would work?

2    A    Each customer would have the pager number, and they

3    would call and put -- maybe the number was 245-3852 star 100

4    which means if they put 100 means they want five bags.  They

5    had a hundred dollars, and they wanted five twenties.  We

6    would give them six twenties for a hundred dollars.

7    Q    And would you actually deliver the drugs?

8    A    Yes.  We would go to their house.  Basically, we knew

9    where all the customers lived at, and we would go to the

10   house and deliver to them.

11   Q    This was not a stand on the street corner type   384 pg

12   operation?

13   A    No, it was not.  At times, we would make sales on the

14   street maybe through hanging out at a bar like Hodge's.  We

15   would hang out at Hodge's at times, get a couple of drinks.

16   While we were there, we may have guys that wanted to -- we

17   may have a couple of people that was drug users that wanted

18   to purchase cocaine from us.

19         Through that, that is how we would end up making

20   sales on the street corners and things like that.

21   Q    You talked about a large amount of crack cocaine,

22   twenty dollar bags, different things.  Can you explain to the

23   jurors please how the crack cocaine would be sold, and if you

24   are familiar with different weights and that sort?

25         For instance, when you say large amounts, how much

Braxton - Direct

1    is a large amount?

2    A    Large amounts can be anywhere from 28 grams, which is

3    an ounce, to -- it could be an eighth, a key or half a key.

4    Q    A kilo is a thousand?

5    A    A kilo is a thousand grams.   A half a key would be 500

6    grams.

7    Q    Did you and Mr. Holland and Mr. Anderson ever buy that

8    much at one time?

9    A    Not me myself.   I have never bought that much at one

10   time, but they have bought large amounts.   I can't say if it

11   was exactly a key.   But over a period of time, it was well

12   over a key.

13            But like if I am present with them at the drug

14   spot, it may have been three or four ounces.   Over a period

15   of time, if you add that all up through the course of two or

16   three years of drug trafficking, then that would total well

17   over a thousand grams or more.

18   Q    I want to ask you about this individual that you named

19   Pito from New York who was the source?

20   A    Yes.

21   Q    Can you tell us where this individual lived?

22   A    Where he lived?   I am not sure where he lived.   Where

23   he distributed was 170 Street and Broadway in Spanish Harlem.

24   Q    What borough is that?

25   A    Manhattan, uptown Manhattan.

214

Braxton - Direct

1    smoke it in.

2    Q    Have you ever been with Sharonda Posey when drugs would

3    be picked up at this individual's location?

4    A    Yes.

5    Q    Has Harvey Holland ever been there when drugs were

6    picked up?

7    A    Just a few times.

8    Q    You know that is important for the jury to hear that

9    when you say a few times, how many times?

10   A    Five or six times.

11   Q    How would the drugs get from this location in New York

12   to wherever they were going to go?

13   A    Well, it depends on how we traveled to New York.  If we

14   traveled to New York by car, it would be put in the car door

15   or maybe under the hood of the car.  Or if we traveled by

16   person, it would be by person.

17         If you traveled without a car, we would take

18   Greyhound to New York, and we would take Amtrak coming back.

19   Whomever, Jabril ~~would have his amount, and Jeffrey~~

20   Hol~~land, he would have his amount, and I~~

21   would have my amount.

22   Q    Where were you staying in New Jersey when you weren't

23   in the Harrisburg area doing this?

24   A    Plainfield.

25   Q    Living by yourself?

296

Hawkins - Direct

1   Q     Did you ever buy crack cocaine from Jeffrey Holland?

2   A     Yes.

3   Q     Can you tell the jurors when you began and how many

4   times you may have purchased from him or how frequently I

5   should say?

6   A     I would buy once, twice a week back in around about

7   '96, '97.

8   Q     Once or twice a week for how long a period?

9   A     About a year.

10  Q     I take it then that you were a crack user at that time?

11  A     Yes.  At that time, yes.

12  Q     Was he, meaning Jeffrey Holland, the only individual

13  that sold to you?

14  A     Jeff, Shawn.  Just them two, Jeff and Shawn.

15  Q     That is a name that I hadn't asked you about.  Who is

16  Shawn?

17  A     Shawn was a friend of Jeff.

18  Q     Would they be together?

19  A     Sometimes.

20  Q     Would you deal with them individually and together

21  depending on the circumstances?

22  A     Sometimes.

23  Q     Could you tell us what amounts of crack cocaine you

24  would buy from them?

25  A     Twenty up to a fifty.

298

Hawkins - Direct

1    Q      How would they know you wanted it?

2    A      I called them.  I paged them.

3    Q      That is what I was asking.  How would they know when

4    you paged that that is what you were paging them for?

5    A      Well, when they paged me back, I would give them my

6    amount, what I wanted.

7    Q      Okay.  What were some of the places you would go to to

8    meet them?

9    A      I would meet them downstairs at the apartment floor.  I

10   meet them up and down the street and meet them.

11   Q      They would essentially bring it to you?

12   A      Yes.

13   Q      Was there ever an occasion when or during the period of

14   time where Mr. Holland and Mr. Anderson actually brought

15   cocaine or crack cocaine to your place for repackaging it for

16   resale?

17   A      Say that again.

18   Q      Was there ever a period of time where Mr. Holland and

19   Shawn Anderson actually brought the crack cocaine to your

20   place where they would repackage it and bag it up for resale?

21   A      Yes.

22   Q      How long a period of time did that last?

23   A      I would say about six months.

24   Q      How frequently during that six month period?

25   A      Twice a week.

Hawkins - Direct

1    Q    Can you tell us what amounts they would be bringing and
2    rebagging?
3    A    About an ounce.
4    Q    An ounce on each occasion?
5    A    Yeah.
6    Q    Don't let me put words in your mouth.
7    A    Each occasion, yeah.
8    Q    Over that period of time that you told us?
9    A    Yes.
10   Q    Now did you get anything from them for letting them use
11   your apartment to do this, or your place, wherever you are
12   staying?
13   A    Yes.
14   Q    What would you get?
15   A    I get fifty to a hundred dollars worth.
16   Q    They would give you crack in exchange for letting them
17   use your place to bag it up and cut it?
18   A    Yes.
19   Q    Do you know -- did they ever tell you, meaning
20   Mr. Anderson or Mr. Holland, where they were getting the
21   crack cocaine from?
22   A    No.  They never tell me that.
23   Q    Not even a city or geographical location or anything
24   like that?
25   A    No.

Anderson - Direct

1  A    Yes.

2  Q    Where was that home located?

3  A    I believe it 2022 Briggs Street.

4  Q    In Harrisburg?

5  A    In Harrisburg.

6  Q    That is not like it was a separate apartment with your

7  own doors.  You were down in the basement, and it was

8  furnished for you and your children; correct?

9  A    Yes.

10  Q    Can you tell the jurors, please, if your brother and

11  your uncle Jeffrey Holland stored crack cocaine down in that

12  area while you were living there?

13  A    Yes, they did.

14  Q    What is it that you saw or observed that makes you say

15  that?  What can you tell the jurors about what was going on?

16  A    ~~I witnessed going into the basement, them sitting at~~ my

17  ~~children's table cutting up crack with a little blade.~~

18  Q    ~~Who is it that you saw doing this?~~

19  A    ~~I saw Jeffrey cutting it down there.  Because the way~~

20  ~~the chairs were set up, just like a two-seater chair.  I~~

21  ~~don't recall — I remember seeing Jeffrey doing it.~~

22  Q    ~~And do you know what type of drug it was?~~

23  A    ~~* I'm not real familiar of drugs, but it looked to me as~~

24  ~~crack cocaine.  It was white.~~

25  Q    ~~It was being cut?~~

347

Anderson - Direct

1  something like that.  And they would get their money prepared

2  and tell the man how much they wanted.

3  Q    Can you describe for the jury please in terms of maybe

4  dimensions of the size of the crack cocaine that was being

5  purchased?

6  A    Maybe the size of a tennis ball.

7  Q    ███████████████████████████████████████████████████

8  A    ███████████████████████████████████████████████████

9  thre██████████████████████████████████

10  Q    Three, four thousand dollars.  Once the crack cocaine

11  was purchased on these occasions, did you transport it back

12  to Harrisburg?

13  A    There was one occasion when me and Sharonda, we would

14  bring it back.

15  Q    How about the other occasions?

16  A    Sharonda was with me, and then she carried it.

17  Q    On the occasions that you were along, you and Sharonda

18  came back to Harrisburg by yourself?

19  A    Yes, we came on the train.

20  Q    And when you say you carried it once, does that mean

21  she carried it the other occasions?

22  A    Yes.

23  Q    How did you carry it when you brought it back?

24  A    In maybe a book bag and had have other things inside of

25  the book bag.

160

Posey - Direct

1    Q    Was he on the first floor; do you remember?

2    A    No.  I think he was in between floors.  He wasn't like

3    a huge building.  It had maybe eight floors.

4    Q    Who would be with you on these occasions?

5    A    Jeffrey.

6    Q    Anybody else?

7    A    Shawn.

8    Q    Anybody else?

9    A    Sometimes Shawn's sister.

10   Q    That would be Toyann Anderson?

11   A    Yes.

12   Q    Anybody else?

13   A    Anthony.  Sometimes Anthony's girlfriend.

14   Q    You said that after Mr. Holland would purchase the

15   drugs from this Spanish drug dealer who you called Poppy,

16   that he would give the drugs to you?

17   A    Yes.

18   Q    How would you get back to --

19   A    That is if it was just me and Mr. Holland.  If it was

20   just us two, I would get in the taxi, and I would meet him in

21   New Jersey.

22   Q    I am sorry?

23   A    On some occasions, we would take other people for just

24   that purpose, to bring the drugs back.

25   Q    How many times do you think you have gone to New York .

161

Posey - Direct

1    to do this?  Can you even put a number on it?    ,

2    A     Me personally you mean, maybe <u>four, five</u>.,

3    Q     Were there ever occasions when you brought the drugs

4    from New York back to Harrisburg?

5    A     Yes.

6    Q     Can you give the jury please an idea of the quantity of

7    drugs that would be purchased on each occasion or dollar

8    amounts, anything of that sort so they can get an idea of how

9    much he was buying on these occasions?

10   A     $2100.00.

11   Q     I'm sorry?

12   A     Maybe $2,000.00 to $2100.00.

13   Q     Do you have an idea from your experience how much drugs

14   he was buying?

15   A     I am not understanding.  You want me to say like was it

16   this big or this big?

17   Q     What I would like you to do is describe what the drugs

18   looked like that he was buying.  And because you have sold

19   before and you have been around him, maybe you know the

20   quantity that you can buy --

21   A     A couple of ounces.

22   Q     A couple of ounces?

23   A     Yes.

24   Q     On each occasion?

25   A     Yes.

454

Holmes - Direct

1   Q      Will you tell us where that would have occurred and why

2   you were doing that?

3   A      It was at this hotel.  At the hotel -- first of all, I

4   think it was Sixth and Reily or Sixth and Harris.  And it was

5   a couple of people with them.  I am not sure who it was in

6   the truck.  But he had said he was going to drop them off and

7   come and get me.

8   Q      Who is the he?

9   A      Jabril.  I waited.  He came back and got me.  He always

10  was with Shawn.  Shawn was always with him.  And we went out

11  to the hotel.  He said do I got my bong with me, which was

12  the crack pipe.

13         When I was out doing drugs, I kept that black hat

14  on, black clothes in disguise.  I would put the pipe up like

15   -- fold the hat up and put the pipe in it just in case the

16  cops ran up on me and checked.  It was in my hat under the

17  fold.

18         Anyway, you got your pipe on you?  I said yeah,

19  and I tried it.  I remember it was crack cocaine.  It was a

20  solid block.

21  Q      How large an amount, if you can describe it, in  the

22  dimensions or whatever did you have?

23  A      Well, it was a block of cocaine.  It wasn't cut up.  It

24  wasn't -- it was just a block, like a dark yellow block.

25  Q      I can see what you are doing with your hands.

455

Holmes - Direct

1    A    Yeah.

2    Q    The court reporter can't catch what you are doing when

3    you do this.  The jurors can see it.  I can see.  Look at the

4    Kleenex box.  Is it bigger than that, smaller than that,

5    flatter than that?

6    A    It probably was about this size.  It was about this -

7    size.

8    Q    What happened?

9    A    He broke --

10    Q    Who is he?

11    A    -- a piece off.

12    Q    Who is he?

13    A    Jabril.

14    Q    What happened?

15    A    I tried it.  Go in the bathroom and tried it.  Went to

16    the bathroom and smoked it.  I was high -- real high.  And I

17    was sitting in the bathroom for like five, ten minutes, and

18    he said are you all right, are you all right.

19         When I smoke crack, their crack, it had me like

20    stuck for a minute.  What I mean by stuck is I was unable to

21    like move right away.  Do you know what I mean?

22    Q    That's because the quality was so good?

23    A    Because of the pureness of it.  And so are you all

24    right?  And I was like um-hum, um-hum.  So he cracked the

25    door.  She's stuck.  She's stuck.  It must be good or

Charge of the Court

1   close to drugs or because a defendant was at a place where

2   cocaine was present and/or associated with individuals who

3   possess cocaine.

4           The second element necessary to the commission of

5   drug dealing deals with knowledge.  The government must also

6   establish that a defendant knew that what he was distributing

7   or possessing was crack cocaine.  And this may be proved by

8   either direct or circumstantial evidence as I have explained

9   those terms earlier.

10          An example of direct evidence would be the

11  testimony of a chemist who has done a chemical analysis of

12  the substance.

13          Circumstantial evidence would be evidence from

14  which you can infer that the material was cocaine such as

15  testimony about its appearance, testimony of persons familiar

16  with the characteristics of the substance, and testimony

17  concerning the prices paid for it.

18          Whether the government relies on direct or

19  circumstantial evidence to prove that the material at issue

20  was cocaine, it must so prove beyond a reasonable doubt.

21          If you find that the materials involved in this

22  case were crack cocaine and that a defendant is guilty of

23  distribution or possession with intent to distribute, you

24  will be asked to determine the approximate quantity of the

25  cocaine involved if you can do so.  And I will say more about

546

Charge of the Court

1    To kill with malice means to intentionally kill

2    another person.  And to satisfy this element, the government

3    must prove that a defendant acted consciously with the intent

4    to kill or that he aided in the killing of Jason Harrigan.

5    However, the government need not prove a

6    subjective intent on the part of a defendant.  It is

7    sufficient if the government proved reckless and wanton

8    conduct such that a defendant was aware that the death of

9    Jason Harrigan was a possible or likely result of his acts.

10    A killing is premeditated when it is the result of

11    planning or deliberation.  The amount of time needed for

12    premeditation depends on the circumstances.  It must be long

13    enough for the actor after forming the intent to kill to be

14    fully conscious of that intent.

15    If a person is killed intentionally without

16    premeditation, then as I have said, the offense is second

17    degree murder.

18    In Count 4, the defendants are also charged with

19    as being aiders and abettors.  Again although the defendant

20    has not committed each and every element of the crime charged

21    in Count 4, he may be guilty of the offense if he helped or

22    encouraged the crime with the intent that it be committed.

23    ~~As~~ ~~twelve, if you find~~

24    De~~fendant~~ ~~conspiracy or there~~

25    dist~~ribution~~ ~~possession~~ of cocaine ~~with the intent to~~

547

Charge of the Court

1   distribute or conspiracy to do the same, ~~you will be~~ asked to
2   determine, if you can, the amount of drugs with which each
3   was involved.

4       The government has the burden of proving drug
5   quantities by proof beyond a reasonable doubt as I have
6   already explained that term.  You must be unanimous in your
7   decision on this point.  ~~Of course, the term quantity means~~
8   ~~weight~~.

9       In determining the amount of drugs involved in
10  these crimes should you so find a defendant responsible, you
11  must indicate the amounts on a verdict form that I will
12  supply to you.  And you will be asked to determine beyond a
13  reasonable doubt the quantity involved in the particular
14  count.

15      The quantity of cocaine categories that we deal
16  with in these cases are fifty grams or more, five grams or
17  more but less than fifty grams, or less than five grams.
18  There are three categories that you can fit into there.

19      That includes the substance of my Charge.
20  Gentlemen, is the government satisfied?

21      MR. BEHE:  Your Honor, may we approach on a
22  matter?

23      THE COURT:  Yes.  Sure.

24      THE COURT:  Is the defense satisfied?  Let me ask
25  that question.

550

Charge of the Court

1    There was a lot of -- there was testimony about

2    this substance crack cocaine. And it was described. Of

3    course, we ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ony about wei▓▓▓▓▓▓▓▓▓▓ th

4    ▓▓▓▓▓▓▓▓▓ But just for your information, I can tell you --

5    and I think that counsel agrees with this -- that fifty grams

6    of cocaine weighs approximately one and three quarter

7    ounces.  It does not weigh much.

8    Five grams weighs .175 of an ounce or less than

9    one-fifth of an ounce.  And one gram weighs .035, thirty-five

10   one hundredths of an ounce.  There is not much weight there

11   either.  The fifty grams is one and three quarter ounces, and

12   the other two weights that are shown there, of course, are

13   considerably less than that.

14   Of the Jeffrey Holland form, Count 3 asks on the

15   charge of unlawfully using a firearm in furtherance of a drug

16   trafficking crime, that is the unlawful distribution of crack

17   cocaine, what is your verdict?  The note there is to assist

18   you.  This count is based on the testimony of Adrienne

19   Stewart who testified that she contacted Jeffrey Holland and

20   arranged to exchange a gun that she had for crack and I

21   believe she said for money.  I think that -- according to her

22   testimony -- that transaction occurred.  So that is what

23   Count 3 is there.

24   Count 4 on both verdict forms deal with the death

25   of Jason Harrigan.  They ask on the charge of causing the

2

1          ( The jury has a question at 3:00 PM.).

2          THE COURT:  Folks, we have the question that you

3     asked about the 20 dollar bag and what it weighs; is that

4     correct? ~~███████████████████████████████~~

5     ~~de███████████████████ect testimony as to the specific~~

6     ~~█████████████████████~~

7          There was no testimony on this point.  I can agree

8     with that.  ~~There was testimony, however, about quantity~~

9     ~~d██████████████████believe, (not necessarily weights)~~  One

10    person described something as big as a box of Kleenex.

11    Another person described some cocaine as maybe the size of a

12    baseball or orange or something I remember.  That is the only

13    testimony that would enable you to come to some conclusion

14    about weight.

15         I did indicate to you I believe that fifty grams

16    weighs an ounce and a half.  You will have to determine, if

17    you can, whether or not the government has proved beyond a

18    reasonable doubt that fifty grams or more, or five or under

19    five grams was distributed.

20         If you find that it was distributed, there was no

21    testimony as to what a bag -- a twenty dollar bag weighs.  We

22    cannot supplement the record at this point with additional

23    evidence.  That is just something that we cannot provide for

24    you.

25         So all I can say is we can't answer that question

3

1    because it isn't in the record, and we can't now add evidence

2    that was not presented during the trial.  So you will just

3    have to do your best with the evidence that you heard.

4            Naturally, we are hopeful that a verdict can be

5    reached in this case, but we don't want anybody to reach a

6    verdict just for the sake of reaching a verdict.  If the case

7    is not resolved today, it will have to be tried by another

8    jury at a later time.

9            That is no reason for you not to stick by your

10    guns if you can't resolve the case, but that is what would

11    happen if we don't arrive at a verdict.  I don't want to

12    let -- don't let me influence you in making a decision for

13    that reason.  I think that is just something that everybody

14    knows, and I thought I should convey to you.

15            That is as much as we can do I think so we will

16    ask you to retire unless you have further questions or

17    comments at this point.

18            MR. BEHE:  Your Honor, before we retire, may we

19    speak at sidebar?

20            THE COURT:  Sure.

21            (An off-the-record discussion was had at sidebar.)

22            THE COURT:  I am reminded of some of the testimony

23    that you heard, and I will review what I recall as being

24    said.  But when I do, ████████████████████████████

25    ████████ that I am crediting that testimony.  That is for

4

1   you to decide whether you believe the witnesses and so

2   forth.

3        But I know that there ████████████ people

4   bagging and preparing m██████████████ at one

5   time.  Somebody referred to a h██ a kilogram.  A kilogram is

6   a thousand grams.  So half a kilo would be five hundred

7   grams.  There was testimony along those lines, but that is

8   for you to recall.

9        And, of course, in addition to recalling it, you

10  have to j████ the credibility of that testimony that was

11  given.

12       By mentioning that to you, I don't want you to

13  overemphasize what I have just reviewed.  That is just going

14  to be part of the overall evidence that you are considering

15  as you reach your verdict.

16       So don't credit what I am saying as something

17  special.  I am just trying to help you by reminding you in a

18  general way of a few of the things that I heard, that might go

19  to weight if you accepted it and believed it and so forth.

20       Okay.  That is as much as we can do.  Thank you.

21  You may continue.

22       (The jury retires to deliberate at 3:07 pm.)

23       THE COURT:  Did counsel wish to place any

24  objection on the record to my remarks?

25       MR. O'CONNELL:  For the record, I would like to

(2151
1/16 '11

JURY QUESTION # 4                     1: CR-01-195-02 + 06

#4

How much Crack (weight)
is in a $20.00 bag?

FILED
HARRISBURG, PA

JUN  6 2002

MARY L. D'ANDREA, CLERK
Per _____

We have no reference to
determine weight. No direct
testimony/evidence as to specific
weight amounts, etc.

Jeffrey Holland 36909-083
United States Penitentiary
Lee County Post Office Box 305
Jonesville Virginia 24263-0305





Office of The Clerk
United States District Court
Middle District of Pennsylvania
228 Walnut St P.O. Box 983
Harrisburg PA 17108

U. S. PENITENTIARY - LEE COUNTY
PO Box
DATE 11-20-07

The enc
procedure
neither cen
or problem over
may wish to retu
or clarification if the
for forwarding to another
enclosed to the above address